(No. 1631, December 2, 1914)
GROSS, KELLY & COMPANY, Appellant, vs. SIMON
BIBO and NATHAN BIBO, Appellees.

SYLLABUS BY THE COURT.

1. A transaction which is capable of being rescinded on the ground of fraud, is to be treated as good until rescinded and not as bad until confirmed; but such contract is not to be considered as rescinded only as of the date of the decree of the court setting the transaction aside, but as of the date of the unequivocal and open declaration of the injured party that he demands a rescission, followed, upon a refusal, by a prompt application to the courts.

P. 503

2. A secret preference, given to one of the creditors signing a composition agreement in order to induce him to assent to the same, renders the composition agreement, as to the innocent creditors who sign the same, voidable only, and such contract continues in full force and effect until the fraud is discovered, and the election to rescind is exercised.

P. 505

3. Consideration, like every other feature and element of a contract, is a matter of agreement, upon which the minds of the contracting parties must meet and agree.

P. 516

4. Hence, where B's creditors signed a composition agreement, whereby they agreed to accept thirty-five per cent of their claims against him in full settlement, but the signature of M, one of such creditors, was obtained by B's agreeing to give him secret preference of fifteen per cent, and G, another of his creditors who had signed the agreement, upon being paid the thirty-five per cent provided for, demanded of B that he execute and deliver to him promissory notes for the sixty-five per cent, which was done, but G at that time had no knowledge of the secret preference given M and did not base his demand upon that fact, but such fact caused B to execute the

notes, because of his fear that G would unearth the fraud,. and all the creditors would attempt to avoid the composition: Held, that the minds of the contracting parties did not meet and agree upon the consideration. Held further, that while G, upon discovering the fraud, could avoid the transaction, and recover the balance of his claim, such fraud, when discovered, would not relate back to the execution of the notes, and supply a consideration,. which was not the consideration upon which the minds of the parties met and agreed.

P. 517

5.  After the voluntary release of a debt, an express promise does not revive it, nor does it form a sufficient consideration to support a new promise.

P. 518:

6.  A naked agreement by one party, not to engage in business in competition with another party, is in contravention. of public policy, ,and therefore void.          P. 519·

7.  Where a contract in restraint of trade is subsidiary to· the main purpose of disposing of an established business, or· other legitimate object, and the restraint is no broader than is necessary to protect the good will of the business sold, the restraint is reasonable and the contract valid.        P. 526:

Appeal from District Court, Bernalillo County; Mer-- ritt C. Mechem, Presiding Judge.   Affirmed.

NEILL B. FIELD, for appellant.

Law presumes that promissory notes, such as those in· suit, rest upon a valid consideration, and in absence of le-- gal evidence sufficient to overcome that presumption, plaintiff was entitled to a directed verdict. 2 Story on Prom. Notes, 7th Ed., Sec. 181; 60 Mass. 364; 2 Best on Ev., Morgan's Notes, Sec. 429; 2 Greenleaf Ev. Secs. 171-2;· Secs. 24, 28, Stats. N. M.; L. 1907, Chap. 83, p. 169; 127· Pac. 1019; 156 U. S. 432; 8 Cyc. 225; 97 Mass. 97; 3 So.. 422.

Evidence offered on behalf of defendants not only negative defense pleaded, but, taken as true, established affirmatively valid consideration for notes. 72 Pac. 761; 1 Parsons on Contracts, 6th Ed. 383; 131 U. S. 246; 137 Mass. 143; 28 Pa. St. 225; 12 Ser. & Rawle, 176; 21 N. H. 128 78 Me. 482; 72 Pac. 761; 131 U. S. 246; 137 Mass. 143; 28 Pa. St. 225.

Plaintiff had right to allege and prove facts showing that composition agreement was void for fraud. 1 Suth. Code, Pl. Sec. 817; 134 U. S. 614.

An agreement by plaintiff not to engage in business in competition with defendant is not unlawful and contravenes no public policy. 193 U. S. 197; 221 U. S. 1, 50-51; Ibid, 54-56, 57-59, 66; 197 U. S. 115; Secs. 1293, 1294 C. L. 1897; 20 Wall 64; 116 Fed. 304; 114 Ia. 574; 45 Minn. 272; 115 Cal. 16; 8 Mass. 223; 114 Mich. 296; 60 N. J. L. 5; 58 N. J. E. 507; 119 N. C. 1; 41 Sou. 203; Wils. Rev. & Ann. St. Okl. 1903, Secs. 819, 820; 88 N. W. 713; 94 S. W. 13; 83 N. W. 842; 106 N. Y. 473; 71 Fed. 659; 64 Fed. 946; 193 U. S. 197; 228 U. S. 177.

VIGIL & JAMISON, for Appellee.

Under no legal theory could plaintiff have been entitled to a directed verdict in its favor upon testimony of defendants. 8 Cyc. 468; 27 L. R. A. 33; 122 Fed. Rep. 355; 4 Fed. Cas. 646; 115 Fed. Rep. 162; 78 Me. 482; 84 Am. Dec. 576; 41 Am. Dec. 406-407; 84 Am. Dec. 576; 24 Me. 561; supra; 11 Col. 301; 3 Metc. (Ky.) 519; 63 N. H. 229; 120 N. Y. 406; 15 Ohio 392; 90 Phil. 99; 7 R. I. 470; 24 Me. 561; 15 Lea (Tenn.) 569; 10 L. J. Exch. 346.

Alleged agreement by plaintiff not to engage in business in competition with defendants was invalid and evidence relating thereto was properly stricken. Page on Contracts, Vol. 1, pp. 584, 686; 52 Fed. 562; 50 L. R. A. 175; 51 L. R. A. 785, 787; 37 S. E. 477; 41 So. 203; 92 Fed. 470; 77 Fed. 29; 52 Fed. 562; 127 Ala. 110; 160 Mass. 50; 125 Mich. 84; 84 Mich. 76; 127 N. C. 457; 171 U. S. 558; 15 N. M. 660; 165 N. Y. 545; 166 U. S. 293; 171 U. S. 578; 194 U. S. 618; 85 Fed. Rep. 271; 221 U.

Gross-Kelly & Co. v. Bibo, 19 N. M. 495

S. 1; 166 U. S. 290; 124 App. N. Y. 401; 139 N. Y. 263-265; 164 N. Y. 404; 171 U. S. 567, 578; 85 Fed. Rep. 271; 196 U. S. 375; 193 U. S. 361; 182 U. S. 205; 221 U. S. 106; 124 U. S. 465.

After real consideration for notes as testified by plaintiff had been stricken out as illegal, plaintiff had no right to allege or prove another consideration. 82 C. C. A. 35; 11 L. R. A. 1069; 209 Fed. 568; 157 U. S. 154; 70 C. C. A. 463; 73 C. C. A. 350; 113 N. Y. 226; 112 N. Y. 652; 64 Ohio. St. 100; 61 Misc. 56.

## MEMORANDUM BRIEF FOR APPELLANT

For purposes of this case words "void" and "voidable" have same meaning. 44 Pa. St. 1; 56 Ia. 201; 67 Fed. 948; 36 Ia. 201.

Legal effect. 39 Conn. 540; 14 Gray (Mass.) 180; 158 Mass. 366; 58 Minn. 195; 115 Fed. 162; 92 Cal. 104.

## ADDITIONAL BRIEF FOR APPELLEES.

Words "void" and "voidable". 44 Pa. St. 1; supra, pp. 14, 15; 52 Fed. 926; 50 Mo. 284; 14 Ohio St. 85; 45 Mich. 108; 46 Mich. 78; 40 Wis. 131; 6 Wis. 645; 46 Mich. 82; 14 Ohio St. 80; 26 N. H. 232; 50 Mo. 284; 36 Ohio 201; 1 N. J. 111; 40 Wis. 131; 50 N. H. 538; L. Rep. 2. H. L. 325, 346, 375; 8 Wright Pa. 9; 4 Daly 171; Par. 206 Bish.; 9 Cyc. 431-3; 27 L. R. A. 33; 14 Gray (Mass.) 180 107 N. Y. 518; 8 Cyc. 477; 81 Hun., p. 9; 46 N. Y. 533; supra, p. 583; 68 Minn. 193; 92 Cal. 104.

### STATEMENT OF FACTS.

This action was instituted in the court below by the appellant, against the appellees, to recover on four promissory notes, dated April 2, 1908, aggregating $8,058.85, and due respectively, on or before October 15, 1908, January 15, 1909, August 1, 1909 and January 1, 1910. The notes contained the ordinary ten per cent attorney's fee clause, and provided for interest at the rate of six per centum per annuum.

The defendants, by their answer, admitted the execution and delivery of the notes, and that the same had not been paid, but alleged that there was no consideration for any of said notes, and set up that on or about March 6, 1908, the plaintiff, among other creditors, accepted and became a party to a creditor's composition agreement, whereby the creditors of the S. Bibo Mercantile Company, of which the defendant Simon Bibo was the owner and proprietor, agreed to accept a thirty-five per cent cash compromise of their respective claims as a final settlement in full of the claims and amounts due to them respectively from the S. Bibo Mercantile Company and the said defendant, Simon Bibo, and they filed with their answer a copy of the composition agreement. They further alleged that the remaining creditors of the S. Bibo Mercantile Company and the defendant, Simon Bibo, accepted said creditors composition agreement, a short time subsequent to March 6, 1908, and that in pursuance of said creditor's composition agreement, said thirty-five per cent of their respective claims was paid to all creditors, in behalf of said S. Bibo Mercantile Company and Simon Bibo, including the plaintiff; that said composition agreement was executed and that all of said creditors, including the plaintiff, released their respective claims against the S. Bibo Mercantile Company and the defendant, Simon Bibo.

They further set up that the amount of their original indebtedness to the plaintiff was $12,398.23; that in pursuance of the said composition agreement they paid the plaintiff $4,339.38, and that there remained unpaid to the plaintiff sixty-five per cent of the original indebtedness, amounting to $8,058.85, and alleged "that the taking, obtaining and securing of these notes was an attempt upon the part of said plaintiff to secure a fraudulent preference over the other creditors after said composition agreement had been accepted by all the creditors, and, upon advise of counsel, that such taking, obtaining and securing was in contravention of public policy."

Plaintiff, by reply, denied that the notes were executed without consideration and alleged that they were made, executed and delivered for a good and valuable consider-

ation received by the defendants at and before the making, execution and delivery thereof; admitted that the plaintiff became a party to and accepted the composition agreement. Denied, that in pursuance of said composition agreement thirty-five per cent of the respective claims was paid to all creditors of the S. Bibo Mercantile Company, but on the contrary, alleged that the S. Bibo Mercantile Company paid to the First National Bank of Albuquerque, one of the creditors, its claim in full, notwithstanding the said composition agreement, and as an inducement to said First National Bank to sign said composition agreement, all without the knowledge of the other creditors, etc. That at the time of the making, execution and delivery of the said promissory notes by the defendants to the plaintiff, the said composition agreement was, and was well known by the defendants to be, voidable at the election of the plaintiff because of the preference before that time agreed to be given by the defendants to the said First National Bank of Albuquerque.

The case was tried to a jury, and plaintiff failed to establish the allegations, as to the secret preference of the First National Bank of Albuquerque. The evidence, however, developed the fact that the McIntosh Hardware Company had been paid fifteen per cent more than the thirty-five per cent agreed upon in the composition agreement. Whether such payment was a secret preference was a disputed question. The evidence for the defendants was to the effect that it was agreed by the other creditors, including the plaintiff, that defendants should have the right to pay some of the small creditors more than thirty-five per cent of their claims to effect a settlement, if necessary, and that the payment in question was made pursuant to said agreement. Plaintiff, on the other hand, offered proof to show the contrary. But it was clearly established that the plaintiff had no knowledge of the alleged secret preference until the fact was developed upon the trial of the cause, whereupon plaintiff asked and was granted leave to file a trial amendment, setting up such facts. Later during the trial, upon motion of the defendants, the paragraph of the reply, setting up the alleged secret preference of the McIn-

tosh Hardware Company was stricken out by the court, upon the theory, that such secret preference being unknown to the plaintiff, at the time the notes were executed, would not furnish or supply a valid consideration for the notes.

The evidence offered on behalf of the defendants, briefly summarized, and viewed in the aspect most favorable to the plaintiff, established the following facts: All the creditors, including plaintiff, had signed a composition agreement, agreeing to accept thirty-five per cent of their claims in full settlement, except McIntosh Hardware Company, who refused to sign unless defendant agreed to pay it fifteen per cent additional, which defendants agreed to do, and did, but this fact was unknown to plaintiff, and was only developed upon the trial of the cause, as stated. Simon Bibo, on April 2nd, 1908, called at the office of plaintiff, and handed George Arnot, plaintiff's representative, a check for thirty-five per cent of its claim, pursuant to the composition agreement which it had signed. Arnot refused to give him a receipt and said that if he would not sign the notes for the balance they would open the whole case again; that he signed the notes without knowing what he was doing. There was other evidence to the same effect, but it is not material and will not be stated. There was also evidence tending to show that the creditors had authorized Bibo to pay some of the small creditors more than thirty-five per cent of their claims, if necessary, in order to effect a settlement, but for the purpose of this case we shall treat the evidence as establishing the converse. At the conclusion of defendants' case plaintiff moved for an instructed verdict, which was denied.

On behalf of the plaintiff, George Arnot testified in rebuttal that plaintiff accepted from the S. Bibo Mercantile Company the thirty-five per cent provided for by the composition agreement and discharged it from all further liability on account of that claim; that subsequent to the signing of the composition agreement by himself on behalf of the plaintiff, he had a conversation with Simon Bibo and Solomon Bibo, in which he told them that inasmuch as they had "stuck" the plaintiff for over $8,000, "I propose to get that money and more back by going into business

in competition with you in Grants or near Grants, and
that I had already had the matter up with a view of select-
ing a place where we would go in"; that on the 2nd day of
April, 1908, Simon Bibo and Solomon Bibo came to the
office of plaintiff and tendered a check in payment of the
thirty-five per cent dividend that was to relieve them and
a receipt was given for the check. Solomon Bibo then ask-
ed in regard to the intention to establish a store at
Grants and Arnot told him it was the intention to start
such a store in order to recover the money lost by plaintiff
in trusting Simon Bibo. Either Solomon Bibo or Simon
told Arnot that if plaintiff would not go into business out
there, they would pay all the money that plaintiff had lost
on the settlement that was made, and they proposed to
give the plaintiff the notes in question if plaintiff would
not go into business at or near Grants, as contemplated, in
competition with S. Bibo and Company. Plaintiff ac-
cepted the notes and refrained from entering into business
in competition with Bibo at or near Grants because of the
execution of the notes, and that the consideration for the
notes was the agreement of plaintiff not to go into busi-
ness, in competition with the Bibos at said place; that prior
to signing the notes he had investigated business conditions
at Grants and was satisfied that by entering into the gen-
eral merchandise and wool business in that vicinity, Gross-
Kelly & Company could recoup all the money it had lost
by the composition agreement; that at the time the notes
were signed he had no knowledge that any creditor had a
secret arrangement whereby they would receive more than
thirty-five per cent as a consideration for their signature
to such agreement.

On motion of counsel for defendants the court struck
out the testimony of Mr. Arnot as to the consideration
for the notes, upon the ground that refraining from start-
ing a store at Grants constituted a contract shown to be
stifling competition and in unreasonable restraint of trade
and against public policy.

Each party moved for a directed verdict in its favor,
and the court sustained the motion of defendants and over-
ruled that of plaintiff, and a verdict was thereupon return-

ed for the defendants, in pursuance of that direction. A motion for a new trial was made and overruled, and plaintiff appeals.

OPINION.

ROBERTS, C. J.—There are three principal and controlling questions presented for determination in this case, which may be stated as follows:

(1) Does a secret preference given to one of the creditors signing a composition agreement in order to induce him to assent to the same, render the composition agreement, as to the innocent creditors who sign the same, void, or only voidable?

(2) It is essential that the minds of the payor and payee of a promissory note meet and agree upon the consideration for which the same is given?

(3) Is a naked agreement by one party, not to engage in business in competition with another party, in contravention of public policy?

While there is a conflict of evidence in this case upon the question as to whether the preference given by the Bibos to the McIntosh Hardware Company was with the knowledge and assent of the appellant, in considering the case we must assume that it was without such knowledge and assent, because the court could not properly have directed a verdict for appellees, in view of such conflict, if their rights were affected by such preference. There was no question but that Gross-Kelly & Company had no knowledge of the alleged secret preference at the time they procured the execution of the notes by the Bibos, as such fact, if full credit be given to the evidence of their representative, was unknown until it developed upon the trial of this case, some two or three years after the execution of the notes. If the secret preference rendered the composition agreement void, Simon Bibo owed Gross-Kelly & Company the money represented by the notes at the time of their execution, and the only question then for determination would be, as to whether this debt, so owing, was the consideration upon which the minds of the contracting parties met and agreed. On the other hand, if such se-

cret preference   rendered the composition   agreement
voidable only, at the election of the innocent creditor or
creditors, the composition agreement would be valid and
effective until the creditor unequivocally and openly de-
manded a rescission, or gave notice of his election not to
abide by the composition agreement.   Hence, if appellant
had no knowledge of the fraud at the time the notes were ex-
ecuted, and had not elected to rescind   because of such
fraud, Simon Bibo would not owe it the balance of the
debt, the compromise and release of which had been secur-
ed by the fraud, for, as stated by Mr. Bispham (Bispham's
Principles of Equity, 4th Ed. Sec. 472.) :

"A transaction which is capable of being rescinded on
the ground of fraud, is to be treated   as   good   until re-
scinded, and not as bad   until   confirmed ;   or, in other
words, that a contract which *may* be set aside at the option
of the injured party, is to be considered as being in ef-
fective operation until that party takes measures to enforce
his right to rescind.   This was well put by Mr. Mellish, in
his argument in Oakes vs. Turquand before the House of
Lords, in the following query : 'when you say that an agree-
ment is voidable and not void, and when the complainant
endeavors to insist upon his right to treat it as void, is the
agreement to be taken as valid until rescinded, or, when
rescinded, to be taken to have been void from the first?
And this query was answered by the tribunal to which
it was addressed to the effect that the agreement *was* to be
taken as subsisting until rescinded ; but with this import-
ant qualification, that it was not to be considered as res-
cinded only as of the date of the decree of the court setting
the transaction aside, but as of the date of the unequivocal
and open declaration of the injured party that he demands
a rescission, followed, upon a refusal, by a prompt applica-
tion to the courts."   Oakes vs. Turquand, L. R. 2 H. L.
Cas. 325 ; and see also 9 Cyc. 431.

Accepting the above, as a correct statement of the law,
the importance of determining whether the secret prefer-
ence rendered the composition   agreement   void, or only
voidable, will be apparent.

An investigation of the text books and reported cases

discussing the question, as to the effect of a secret prefer-
ence given to a creditor to induce him to sign a composi-
**2** tion agreement, on the rights of innocent creditors who
sign the same, will disclose that the words "void" and
"voidable" are used interchangeably, and without appar-
ent distinction as to meaning. The two words, however,
in so far as the rights of the parties to this case are con-
cerned, have a widely different meaning. In many cases
it is perhaps true that a distinction between the meaning
of the words would be of no consequence. For example, in
the present case, if Gross-Kelly & Co. had discovered the
fraud prior to the execution of the notes, and had elected
not to be bound by the composition agreement, such agree-
ment would have been void as to them at the time the notes
were executed, for by their election they would have made it
void from the time of such election. For this reason perhaps
the word "void" is often used when in fact "voidable"
would be the technically correct expression. The following
quotation from the case of Van Shaack vs. Robbins, 36
Iowa 201, is illustrative of the fact that the word "void" is
not always used to convey the idea that a contract is null and
incapable of ratification.

"The word 'void' has, with lexicographers, a well-de-
fined meaning: 'of no legal force or effect whatsoever;
null and incapable of confirmation or ratification.' Web-
ster's Dic. 'But it is sometimes and not unfrequently,
used in enactments by the legislature, in opinions by
courts, in contracts by parties and in arguments by coun-
sel, in the sense of *voidable; that is capable of being avoid-
ed or confirmed.' Ib. The word 'void' when used in any of
these instruments, will therefore be construed in the one
sense or the other, as shall best effectuate the intent in its
use, which will be determined from the whole of the lan-
guage of the instrument and the manifest purpose it
was framed to accomplish. * * *

These cases abundantly show that the word *void* does
not always mean null and incapable of confirmation; but
its true meaning is always to be determined from all the
language used and the intent thereby manifested. Where
the word is used to secure a right to or confer a benefit on

the public, it will, as a rule, be held to mean *null and incapable of confirmation.* But if used respecting the rights of individuals capable of protecting themselves, it will often be held to mean *voidable* only."

From an investigation of many of the reported cases, we find that where a court means "relatively void" as distinguished from "absolutely void", the word "void" is used as often, if not more so, than the word "voidable", to indicate that meaning, as it is seldom necessary to distinguish the meaning of the words, where the act has been avoided by the innocent party who has the right to avoid it. In the case of Terrell vs. Anchauer, 14 Ohio St. 85, we find the following:

"And the use of the word 'void' in a loose and uncertain sense is no novelty either in legislation or the language of jurists."

Then the Ohio case  quotes  Allis v. Billings, 6 Metcalf, 417, which takes the position that the word void ought to be applied only to those contracts that are absolutely void and that it should not be used to indicate what other jurisdictions say is relatively void. The court said:

"The term 'void' as applicable to conveyances or other agreements, has not at all times been used with technical precision, nor restricted to its peculiar and limited sense as contradistinguished from 'voidable'; it being frequently introduced, even by legal writers and jurists, where the purpose is nothing further than to indicate that a contract was invalid, and not binding in law. But the distinction between the terms 'void' and 'voidable', in their application  to contracts,  is often one  of great  practical importance;  and whenever entire technical accuracy is required, the term 'void' can only be properly  applied to those contracts that are of no effect whatsoever; such as are a mere nullity, and incapable of confirmation and ratification."

In Beecher vs. Marq. & Pac. R. M. Co., 45 Mich. 108, Judge Cooley says:

"If it is apparent that an act is prohibited and declared void on grounds of general policy, we must suppose the legislative intent to be that it shall be void to all intents;

while if the manifest intent is to give protection to determinate individuals who are sui juris the purpose is sufficiently accomplished if they are given the liberty of avoiding it."

In Fuller vs. Hasbrouch, 46 Mich. 78 p. 82, the court said:

"There is undoubtedly some difficulty in harmonizing all the provisions of this statute. The statute declares the assignment 'void' if the bond is not filed; but this word is frequently used in the sense of voidable (Beecher vs. Marq. & Pac. R. M. Co., 45 Mich. 103) ; and it must have that construction here if it shall be necessary to give other provisions of the statute effect."

In Bromley v. Goodrich, et al., 40 Wis. 131, at pp. 139, 140, the court said:

"Probably no words are more inaccurately used in the books than *void* and *voidable*. Statutes not unfrequently declare acts void, which the tenor of their provisions necessarily makes voidable only. Perhaps the best excuse made for such inaccuracy is that of Parker, C. J., cited and adopted by this court: 'Whatever may be avoided, may, in good sense, to this purpose, be called void, and the use of the term *void* is not uncommon in the language of statutes and of courts. But in regard to the consequences to third persons, the distinction is highly important, because nothing can be founded upon what is *absolutely void;* whereas, from those which are only voidable, fair titles may flow. These terms have not always been used with nice discrimination; indeed in some books there is a great want of precision in the use of them', 6 Wis. 645."

We have been able to find no case in which, where the word voidable is used the court's meaning was that the contract or instrument, or legislative enactment, in question was absolutely void, but these cases heretofore cited, along with many others, indicate that the books are full of cases where the word void has been used without qualification and the court has meant "relatively void". The logical conclusion, therefore, is that where the word void is used, it is necessary to examine the context, whether it be a legislative enactment, a judicial opinion or a contract

or conveyance, in order to definitely ascertain whether or not "absolutely void", or "relatively void", is meant. Fuller vs. Hasbrouch, 46 Mich. 82; Terrell vs. Anchauer, 14 Ohio, St. 80; State vs. Richmond 26 N. H. 232; Kearney vs. Vaughan, 50 Mo. 284; Van Shaack vs. Robbins, 36 Iowa, 201; Inskeep vs. Lecony, 1 J. J. L. 111; Bromley vs. Goodrich, 40 Wis. 131; Brown vs. Brown, 50 N. H. 538.

If the composition agreement in this case was rendered either void or voidable it was by reason of the fraud practiced on the appellant and the other innocent creditors, in inducing them to assent to the composition under the belief, and upon the representation, that all the creditors would be dealt with upon the same terms of equality; that all the creditors would receive thirty-five per centum of their debts and no more. When, therefore, they were induced to sign upon this understanding, and the debtor had in fact promised or agreed to give the McIntosh Hardware Company fifty per centum of its claim, their signature to the composition contract, and assent to the agreement, were procured by fraud. The preferring of one creditor over another, in a composition agreement, does not render the contract invalid, or subject to dissaffirmance, if such preference is known and assented to by the creditors who become parties to the agreement. It is not contrary to public policy to pay one creditor more than another in order to secure the satisfaction of the debt, hence it could not be argued that such a contract, so providing, would be invalid and void on that ground. It is the fraud practiced on the innocent creditors, by which they are induced to give their assent to the composition, which renders the contract "voidable", and as the fraud injures the individual or individuals, rather than the public, the contract is relatively void or voidable only. In Bishop on Contracts, Sec. 198, the author says:

"Where the party makes the contract he means to, being moved thereto by fraudulent representations, rights vest under it. The other party, who has perpetrated the fraud, cannot take them away. As to him, the contract is perfect. The defrauded party, on discovering the fraud, has his election, where the principles of equity will permit

its exercise, to reject the contract; or, if he will, he can confirm it. Therefore, it is not void. The legal term for it is voidable."

At Section 206 of Bishop, he says:

"Though a defrauded party cannot both rescind a contract and affirm it, he may, as we have seen, elect between the two; and, if he chooses, do the latter. Any act of which, after knowledge of the fraud by which he treats the contract as subsisting, will be an affirmance. There can be no rescission afterward. The party in the wrong cannot set up his own fraud; the contract, therefore, is perfected."

In 9 Cyc. 431-3, we find this statement:

"On discovering the fraud by which he was induced to enter into a contract, the party defrauded may elect whether he will treat the contract as binding or refuse to be bound by it; but until he so elects it continues valid. An agreement procured by fraud is *voidable and not void*. A contract obtained by fraud, being voidable and not void, may be ratified by the party who was induced by the fraud to enter into the contract."

Cases are cited sustaining this proposition concerning fraud, from Kansas, Kentucky, Massachusetts, New York, New Hampshire, South Carolina, United States and England, and we think we are not hazarding an inaccurate statement when we say that there is no conflict concerning the proposition that fraud makes a contract voidable instead of absolutely void.

It is clearly established that in a secret agreement of this character between a debtor and one or more creditors, the guilty creditors are not allowed to recover upon their original indebtedness, but under the weight of authority, they can recover under the composition. Some cases go so far as to hold that even their rights under the composition are forfeited, but this is by no means the general rule. If by a secret agreement of this character, however, the composition was rendered "absolutely void" as distinguished from "relatively void" or "voidable" there could be no other logical conclusion, but that the composition agree-

ment was thereby rendered the same as if it had never existed, a mere nullity, something under which no legal rights of any character could vest. Then, if the composition agreement is absolutely void, it cannot be good as to some, the guilty, and bad as to others, the innocent, but it is a nullity and no rights of any character in favor of any one could vest under it. This is the view which is taken in Pearsoll vs. Chapin, 44 Pa. St. 1, which distinguishes between contracts which are absolutely void and those which are relatively void, and also the view which is taken in legal text works and judicial decisions distinguishing between "void" and "voidable". If the composition agreement, therefore, was absolutely void, the guilty creditors would be restored to their cause of action upon the original indebtedness along with the innocent creditors. What other logical conclusion could there be? The composition agreement is the only thing that stands in the way of an action on the original indebtedness in favor of the guilty creditor who has received the secret fraudulent preference against the debtor, and if that agreement is a nullity what is there to deprive such guilty creditors of their original cause of action? If the meaning given by almost universal judicial opinion to "absolutely void" is that of a nullity, the result we have indicated above must follow.

This point is clearly argued by Judge Gray of the New York Court of Appeals, in the case of Hanover National Bank vs. Blake, 142 N. Y. 404, 27 L. R. A. 33, at p. 40, where he says:

"If we should say that the fraud of the secret agreement made by the creditor operated to avoid the whole transaction of composition, the result would be to leave him with the original indebtedness unreleased. If the composition agreement, by which the debt was compromised, is to be deemed nullified by the fraudulent transaction, I do not see why the *creditor would not be at liberty to pursue the original debt;* a view which Littledale, J., regarded as possible in Howden v. Haigh. It would certainly seem to be the logical outcome of the proposition asserted below that, if the composition agreement has been avoided, it has become inoperative as an agreement for any purpose."

That the composition agreement is thereby rendered *relatively void* or *voidable,* in favor of the innocent creditors, but not in favor of the guilty creditor, is shown in Huckins vs. Hunt, 138 Mass., 366-7. The plaintiff agreed with the debtor that the debtor should pay the full amount of the debt to him in the future and the court said:

"This avoided the composition deed as to the other creditors, but the plaintiff was bound by it and cannot set up his own illegality to relieve himself from its consequences."

In the case of Partridge vs. Messer, 14 Gray, (Mass.) 180, 182, it is said that:

"An agreement procured by fraud may be avoided by him on whom the fraud is practiced; he by whose fraud the agreement is procured not being permitted to set up the agreement as a defense against him whom he has defrauded."

It will be noted that the words "may be avoided" are used, showing power or an option on the part of the innocent to declare the composition agreement avoided.

In the case of White vs. Kuntz, et al., 107 N. Y., 518, the decision of the court leads to the same conclusion. In order to induce the plaintiff, White, to sign the composition agreement, Kuntz, the father of the debtor, secretly agreed to purchase of him the composition notes within a specified time at the price of $10,000 when the composition notes aggregated only $6,000. Kuntz, the father, refused to perform the secret agreement. Thereupon plaintiff filed his complaint, alleging these facts, and also that other creditors had been induced to sign by a secret agreement that they should receive a greater percentage than the one-third provided for in the composition agreement, and, therefore, that the composition agreement was void as to him, the plaintiff. He demanded its cancellation and a judgment against the debtor for the amount of the original indebtedness. Demurrer to the complaint was sustained in the trial court and the appellate court affirmed the judgment of the nisi prius court. If the composition agreement had been made a nullity, or absolutely void, by the secret fraudulent agreements, both with Kuntz, and the other creditors, upon what principle of law could

Kuntz have been prevented from suing upon his original indebtedness? He would have stood in the same position as if the composition agreement had never been thought of.

"A fraudulent preference does not ipso facto, deprive an innocent creditor of his rights under the composition. The debtor cannot set up its invalidity as against such a creditor and an innocent creditor, may, therefore, at his option, insist upon the performance of the composition according to its terms in so far as he is concerned." 8 Cyc. 477.

In the case of Martin v. Adams, 81 Hun. (N. Y.) 9, at 14, we find the following:

"But the referee finds that 'in or before the month of July, 1888, and before the last compromise notes were paid, the plaintiffs herein were informed of the alleged frauds committed in relation to said compromise, as set forth in said complaint, and with such knowledge the plaintiffs, and each of them, received and accepted the money due on said notes, which became due in August, 1888, without protest or objection.' And that 'after the payment of said last-mentioned compromise notes, and before the commencement of this action, the said plaintiffs did not, nor did either of them, obtain or acquire any additional information in relation to said alleged frauds.'

Thus it appears that with full knowledge of all the facts which the plaintiffs have proved, they proceeded in affirmance of the contract.

They retained in their possession the notes not yet matured. At maturity they accepted the payment of them and surrendered the notes. Immediately thereafter this suit was commenced, but too late, for the rule is well settled that one who takes a benefit under a contract after knowledge of the fraud which vitiates it, is not thereafter entitled to have the contract adjudged fraudulent. Cobb v. Hatfield, 46 N. Y. 533."

Another case in point is found in Babcock v. Dill, 43 Barbour (Sup. Ct. Rep.) 577. As we understand the general rule, the innocent creditor who decides to avoid the composition agreement, is not compelled to restore what he has been paid, the reason being that the money paid is referred to the original indebtedness and treated as a payment

upon the original indebtedness, but in those cases where the debtor has not been the person to pay the money under the composition agreement, but it has been done by, for instance, the father of the debtor on account of his interest in his son's welfare, a different rule applies. This is true, because a payment by the father who owed nothing to the creditors could not be referred to anything but. the composition agreement and if that was invalid, it was necessary to return the money. In the case of Babcock vs. Dill, supra, at 583, we find the following:

"At all events, they could not receive and retain the forty per cent and reject that part of the agreement which required them to cancel their debts. If they desired to raise the questions which the plaintiff now raises to avoid the contract, they should have returned the forty per cent to the old gentleman. . If they discovered that they had been defrauded into the agreement, and desired on that account to rescind, they could only do so by returning the moneys which the old gentleman paid them to cancel their demands. It is no answer to say that the contract was for the benefit of Robert L. Dill, and that he ought to be held responsible for the balance of the demand. It was also for the benefit of the creditors; and they must take the burden as well as the benefit of it. It would be an outrage upon the father to keep his money and refuse to discharge his son. . The father had an interest in his son's welfare which furnished a highly meritorious consideration for his engagement with the creditors to pay them the forty cents upon the dollar, upon their agreement to discharge his son from further liability."

In other words, they had a right to affirm the composition even after knowledge of the fraud, as in case of any other fraudulent contract, or they had a right to reject it and restore the forty per cent to the father which they must do, since on the original indebtedness the father owed them nothing, as we have stated, and said payment could not be referred to the original indebtedness.

This view was also taken in the case of Powers Dry Goods Co. vs. Harlin, 68 Minn. 193:

"By reason of the fraud it was within the power of the

innocent creditors to ignore the composition, and recover the balance due upon their claims."

These words "within the power" show an option such as the innocent party can exercise in any fraudulent contract which is voidable or relatively void. If it was absolutely void it would not be *within the power* of the innocent creditors to ignore the composition. They would have to ignore it. It would be as if nothing existed; the law would have made it a nullity and they would have had no power in, over or concerning it.

The same principle which is applied in White vs. Kuntz, supra, is applied in O'Brien vs. Greenebaum, 92 Calif. 104, where a guilty creditor was denied relief on account of secret fraudulent preferences granted to other guilty creditors of which he knew nothing.

In the case of Batchelder & Lincoln Co. vs. Whitmore, 122 Fed. 355, Judge Putnam, speaking for the Circuit Court of Appeals, First Circuit, says:—

"It should be observed in this connection that, even if the transaction between the bankrupt and the Batchelder & Lincoln Co., had been fraudulent in intent, this would not have rendered the composition void so far as the other creditors were concerned, because, notwithstanding the forms of expression heretofore used by the text books and the courts, the modern rule is that, with rare exceptions, transactions are not void, but voidable."

In the case of Mallalieu vs. Hodgson, 71 Eng. Com. Law Reports 689, the court said: (Speaking of fraud in a composition agreement).

"And in Pilbrow vs. Pilbrow's Atmospheric Railway Co., 5 Com. D. 440, 453 (there cited) Maule J., said: 'It is not true, that a deed that is obtained by fraud, is therefore void. The rule is, that the party defrauded may, at his election treat it as void.' In Murray vs. Mann, 2 Exch. 538, 541 Parke B., said 'Fraud does not make the contract actually void, but only voidable at the election of the party.' While therefore the contract in the present case was not avoided, the duty of the plaintiff still attached."

Our conclusion, therefore, is that the composition agreement in this case was voidable only, at the election of the

innocent creditors, and until the fraud by which they had been induced to sign the composition agreement was discovered, and the option to rescind was exercised, the contract continued in force and effect. This being true, at the time Bibos signed the notes in question here, they did not owe Gross-Kelly & Co. the sixty-five per centum of the old debt which had been surrendered and released by the composition agreement, and the payment of the thirty-five per centum thereunder.

It is true of course that Gross-Kelly & Co. had the right to avoid the composition agreement, upon discovery of the fraud by which they had been induced to assent to it, and that they could retain the thirty-five per centum which had been paid them and sue for the recovery of the balance of their original indebtedness. But this is not such an action. Here they are seeking to recover principal, interest and attorney's fees on three promissory notes, which would have no connection with the original indebtedness, unless the balance of such indebtedness was owing and unpaid, and entered into and became the consideration for the notes, and both parties so understood.

Under the facts, established upon the trial, viewed with the utmost liberality toward appellant, it had no knowledge at the time it demanded and secured the execution of the promissory notes in question, that appellees had given the McIntosh Hardware Company an unlawful, secret preference in order to induce it to sign the composition agreement. It may be admitted that Simon Bibo, at that time had knowledge of the preference, and that his guilty knowledge induced him to readily assent to the execution and delivery of the notes, in order to prevent appellant from attacking the composition; and that the composition agreement could have been avoided by appellant, upon discovery of the fraud, still the question remains, as to whether the original indebtedness, which appellant had agreed to release, but which agreement it might, at its election, either avoid or affirm because of the undiscovered fraud, upon acquiring knowledge thereof, was the consideration upon which the minds of the contracting parties met and agreed. The fear of discovery may be assumed to have

been the motive which prompted Bibo to execute the notes, but "the 'motive' for entering into a contract and the 'consideration' of the contract are not the same." Elliott on Contracts, Sec. 204. Consideration, like every other

**3** feature and element of a contract, is a matter of agreement, upon which the minds of the contracting parties must meet. As stated by Mr. Justice Strong, in the case of Philpot vs. Gruninger, 14 Wal. 570:

"It is however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration of the contract. Nothing is consideration that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is 'the cause or meritorious occasion requiring a mutual recompense in fact or in law'."

In the case of Fire Insurance Association vs. Wickham, 141 U. S. 564, Mr. Justice Brown says:

"To constitute a valid agreement there must be a meeting of minds upon every feature and element of such agreement, of which the consideration is one. The mere presence of some incident to a contract which might under certain circumstances be upheld as a consideration for the promise, does not necessarily make it the consideration for the promise in that contract. To give it that effect it must have been offered by one party and accepted by the other as one element of the contract. In Kilpatrick vs. Muirhead, 16 Penn. St. 117, 126, it was said that 'consideration', like every other part of a contract, must be the result of agreement. The parties must understand and be influenced to the particular action by something of value or convenience and inconvenience recognized by all of them as the moving cause. That which is a mere fortuitous result flowing accidentally from an arrangement, but in no degree prompting the actors to it, is not to be esteemed a legal consideration."

See also Elliott on Contracts, Sec. 204; 1 Addison on Contracts, 15; Ellis vs. Clark, 110 Mass. 389; Levy & Cohn Mule Co. vs. Kauffman, 114 Fed. 170.

That the minds of contracting parties to these notes did not meet and agree upon the consideration is evident.

Appellant was attempting to secure a promissory note for a debt which it had agreed to release. It had signed the composition agreement, and could not subsequently withdraw its assent without the consent of the other creditors, until after the time for compliance by the debtor had expired, or the agreement was breached by the debtor. Of course if it had knowledge of a secret preference given to some other creditor it could avoid the contract, but until it discovered the fraud and elected to avoid, it could hardly be contended that the notes executed without consideration could be supplied with that necessary factor by the after discovered fraud, and appellant's election to avoid.

The question is, what was the present consideration for the notes at the time of their execution, upon which the minds of the parties met and agreed? It must be evident there was none, for the debt which appellant was attempting to transmute into the notes, was discharged by the composition agreement and its fulfillment or tendered compliance by Bibo; subject of course to its avoidance by appellant, upon discovery of the fraud. But at this time it had not discovered the fraud and elected to rescind, consequently it did not have in mind, as a consideration for the notes, the balance of its claim which it was entitled to collect because of appellee's fraud in giving a secret preference to the McIntosh Hardware Company, and did not offer this as the consideration, and it was consequently not regarded as the consideration by both parties. At the time the notes were given Bibo did not owe appellant the money represented by the notes, for this debt had been discharged by the composition agreement and the payment of the thirty-five per cent therein provided for. It is true, he might, at the election of appellant, have been indebted to it in this sum, assuming the fraud to have existed, still, until appellant exercised its option of avoiding the contract, upon discovery of the fraud, the past indebtedness, which appellant supposed was discharged, could not have been recognized by it as the moving cause, or element

which it presented to Bibo as a consideration for the notes, and upon which the minds of the contracting parties met and agreed.

Appellant contends that the moral obligation to pay the debt was a sufficient consideration for a new promise to pay it, provided the new promise was not made until after the composition was completed and was not intended to secure an advantage to the creditor as a consideration for his signature to the composition agreement. In support of this proposition the case of Willing vs. Peters, 12 Ser. & Rawle, 177 is cited, which concededly so holds. No other case has been called to our attention which supports this theory of the law, and the authority of the case cited was essentially impaired by the case of Snevily vs. Read. 9 Watts, 396. The following quotation from the case of Sheppard vs. Rhodes, 7 R. I. 470; 84 Am. Dec. 573, fully answers this contention.

"The case here is one where the original right of action was extinguished, not by the act of the law, but by the act of the parties. It was a voluntary release of the debt by the creditor to the debtor. In Willing v. Peters, 12 Serg. & R. 179, the question arose, how far a promise to pay a debt thus discharged might be enforced;·and because of the analogy between waiving a discharge created by act of law and one created by act of the parties the court upheld the action. Shaw, C. J., in Valentine v. Foster, 1 Met. 522 (35 A. M. Dec. 377), admits the closeness of the analogy, and suggests if the rule be not narrow that allows the waiver in the one case to bind the party, and rejects it in the other; but he adds, that the Pennsylvania authority is the only one he has been able to find in support of the doctrine; and in the case then before him, ruled that when a creditor released a debtor to make him a witness, the subsequent promise of the debtor was not binding. Considering his own decision, and that the case of Willing vs. Peters, 12 Serg. & R. 179, was subsequently overruled in the same court as Snevily v. Read, 9 Watts, 396, while in other courts it has been repeatedly adjudicated, that after the voluntary release of a debt, an express promise does not revive it, nor does it form a· suf-

ficient consideration to support the new promise, we may affirm that such at present is the settled law: Warren v. Whitney, 24 Me. 561; Stafford v. Bacon, 1 Hill, 533 (37 A. M. Dec. 366).

The following cases support the case of Sheppard vs. Rhodes, supra: Rasmussen v. State Nat. Bank. 11. Colo. 301. 18 Pac. 28; Montgomery v. Lampton, 3 Metc. (Ky.) 519; Grant v. Porter, 63 N. H. 229; Soebisch v. Von Minden, 120 N. Y. 406; 24 N. Y. 795; Way v. Langley, 15 Ohio St. 392; Callahan v. Ackley, 9 Phila. (Pa.) 99, 30 Leg. Int. (Pa.) 12; Sheppard vs. Rhodes, 7 R. I. 470, 84 Am. Dec. 573. Warren v. Whitney, 24 Me. 561, 41 Am. Dec. 406; Evans v. Bell, 15 Lea (Tenn.) 569; Cowper v. Green, 10 L. J. Exch. 346. 7 M. & W. 633.

From what we have said it is apparent that the court properly refused to direct a verdict for the appellant on this phase of the case and no error was committed in directing a verdict for the appellees.

There is another question, however, which requires consideration. As shown in the statement of facts, appellant offered testimony to show that the consideration for the notes was an agreement on the part of appellant not to engage in business at Grants, New Mexico, in competition with Bibo, who was at that time engaged in the mercantile business at that place. This testimony was stricken out by the court, upon the theory that such an agreement was in contravention of public policy, and therefore unlawful. Appellant contends that an agreement by it not to engage in business in competition with appellee is not unlawful and contravenes no public policy, and therefore furnishes a good and valuable consideration for the notes, even though such agreement was not incidental or ancillary to a valid contract for the sale of an established business and its good will, and for the purpose of protecting the good will of the business sold.

Such an agreement is universally condemned, and held to be contrary to public policy and void, by all the standard text books, dealing with the subject. Elliott on Contracts, Sec. 814, lays down the doctrine as follows:

"The agreement restraining trade must be incidental to

and in support of the contract of sale by which the one in whose favor it runs acquired some interest in the business he seeks to protect. One can not make a valid contract in restraint of trade no matter how limited as to space or time where he does not purchase the good will or any interest in the matter and the main object of which is to stifle competition."

In Page on Contracts, Vol. 1, page 584, it is stated:

"Contracts whereby one or both of the parties thereto are restrained from engaging in a business, trade, or profession are of two kinds: (a) those which are a part of a transaction involving the good will of a business, which are designed to protect such good will, and to that end to restrain some person or persons from engaging in business, and (b) those which have for their primary object not the protection of good will, but the formation of a monopoly in a given business. The first class, if objectionable at all, is so because the restraint is unreasonable; the second class is always illegal."

On page 686 of the same volume, the author says:

"Buying off Competition. Where without a sale of good will, or other legitimate dealing therewith, one party agrees with the other to abstain from business, such contract is invalid without regard to its reasonableness as to either space or time. Such contracts are equally invalid whether the competition is suppressed directly or indirectly."

A brief review of the decided cases on this proposition will show ample support for the texts above quoted. In Oliver vs. Gilmore, 52 Fed. 562, the court said:

"A contract between manufacturers, whereby the first party agrees, in consideration of a percentage on the sales made by the second party, not to use his plant for the production of strap and T hinges for five years, the contract to be void in case the second party increases his facilities for the production of such hinges, is void as against public policy."

In the case of United States vs. Addyston Pipe & Steel Co., 85 Fed. 271; 29 C. C. A. 141; 46 L. R. A. 122, Judge Taft, speaking for the Circuit Court of Appeals, said:

"It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of· an unjust use of those fruits by the other party. In Horner v. Graves, 7 Bing. 735, Chief Justice Tindal, who seems to be regarded as the highest English judicial authority on this branch of the law (see Lord Macnaghten's judgment in Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co. (1894) A. C. 535, 567), used the following language: 'We do not see how a better test can be applied to the question whether reasonable or not than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either; it can only be oppressive, and if oppressive, it is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy'.

This very statement of the rule implies that· the contract must be one in which there is a main purpose, to which the covenant in restraint of trade is merely ancillary. The covenant is inserted only to protect one of the parties from the injury which, in the execution of the contract or enjoyment of its fruits, he may suffer from the unrestrained competition of the other. The main purpose of the contract suggests the measure of protection needed, and furnishes a sufficiently uniform standard by which the validity of such restraints may be judicially determined. In such a case, if the restraint exceeds the necessity presented by the main purpose of the contract, it is void for two reasons: First, because it oppresses the covenantor, without any corresponding benefit to the covenantee; and, sec-

ond, because it tends to a monopoly. But where the sole object of both parties in making the contract as expressed therein is merely to restrain competition, and enhance or maintain prices, it would seem that there was nothing to justify or excuse the restraint, that it would necessarily have a tendancy to monopoly, and therefore would be void. In such a case there is no measure of what is necessary to the protection of either party, except the vague and varying opinion of judges as to how much, on principles of political economy, men ought to be allowed to restrain competition. There is in such contracts no main lawful purpose, to subserve which partial restraint is permitted, and by which its reasonableness is measured, but the sole object is to restrain trade in order to avoid the competition which it has always been the policy of the common law to foster."

In Tuscaloosa Ice Manufacturing Co. vs. Williams, (Ala.) 50 L. R. A. 175, the court said:

"As said by Putnam, circuit judge, in Oliver v. Gilmore, 52 Fed. Rep. 568: '* * * When the covenantor surrenders his trade or profession, an equivalent is given to the public because, ordinarily, as a part of the transaction, the covenantee assumes and carries on the trade or profession, nothing is abandoned, and only a transfer is accomplished. The same occupation continues; the same number of mouths are fed.' And these considerations obtain where one already engaged in a business in good faith, for the purpose of enlarging and increasing his business, purchases the stock in trade or practice or plant of a rival, and incident thereto takes the covenant of the seller not to engage in the same business, within the territory covered by the consolidated enterprise, and in all such cases the covenant in restraint of trade is a reasonable one and valid. But there is no room for the application of these reasons to cases in which the covenantee does not purchase the business, practice, trade, or plant of the covenantor, and the transaction involves nothing but a bald covenant in restraint of trade, for which there is no other consideration than the payment of money for the obligation itself. In such case the business of the covenantor is not

transferred merely; it is destroyed. His plant is not continued by the covenantee in useful production, but is left to rust and canker in disuse. The public loses a wealth-producing instrumentality. Labor is thrown out of employment, 'The same number of mouths' are not fed. The consideration the covenantor receives is not the just reward of his skill and energy and enterprise in building up a business, but is a mere bribery and seduction of his industry, and a pensioning of idleness. The motives actuating such a transaction are always, in a sense, sinister and baleful. Its purpose and effect are, not to protect the covenantee in the legitimate use of something he has acquired from the covenantor, but to secure to him the illegitimate use, or the use in an illegitimate way, of that which he already has, in respect of which there is no reason or occasion for the covenantor to assume any obligation of protection. Such an undertaking in restraint of trade, however limited as to time and place, would seem, upon all general principles, though we know of no case expressly and directly so deciding, to be necessarily unreasonable and vicious on the consideration alone that it is not entered into nor has it the effect of protecting some buhiness, practice, trade, or interest which the covenantor has sold to the covenantee."

In the case of Clark vs. Needham, 51 L. R. A., 785, the Supreme Court of Michigan discusses the distinction between a contract in reasonable restraint of trade and one which tends to create or continue a monopoly. In this case the restraint was unlimited as to territory, but cases cited in the opinion such as Maxim Nordenfelt Guns & A. Co., vs. Nordenfelt, 1 Ch. 630, show that a restraint, unlimited as to territory, may be good if such restraint is necessary to protect the covenantee in the business which he acquires, especially in these days when some corporations trade all over the world in the commodities manufactured by them. The court said:

"Any such contract is invalid, whether the restraint be for one year or any number of years, or is unlimited as to time. The agreement to close one part of a business is as much against the policy of the law as a contract to close

the entire. The one is as reprehensible as the other. They only differ in degree. Under this contention a party might agree with one person to close one part of his manufactory, and then agree with the second person to close the other part; the two constituting his entire business. In U. S. vs. E. C. Knight Co., 156 U. S. 1, 16, 39 L. ed., 325, 331, 15 Sup. Ct. Rep. 249, it is said: 'All the authorities agree that, in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition'."

In Webb Press Co. vs. Bierce, 116 La. 905, 41 So. 203, a contract by which one who had contemplated engaging in lawful business in a certain place for a pecuniary consideration agreed with one with whom he had had no previous relations, and who also contemplated engaging in the same business at the same place, to abandon his plan, was held void as an unreasonable restraint of trade.

In the case of Clemmons vs. Meadows, 123 Ky. 181, 94, S. W. 13, 6 L. R. A. (N. S.) 847, a contract between the proprietors of the only two first class hotels, in Fulton, Kentucky, to close one of the places for a money consideration to be paid by the proprietor of the other, in order to give the latter a monopoly of the business was held contrary to public policy and void.

Appended to this case will be found a very instructive note reviewing the American cases which have discussed the question as to the validity of a stipulation not to engage in a particular business, when not ancillary to a lawful contract.

The rule announced by the Kentucky court was followed in the two later cases of Barrone et al. vs. Moseley Bros., 139 S. W. 869, and Field and Son vs. Holland and Son, 165 S. W. 699.

Other cases to the same effect will be found cited in the note to Clemmons vs. Meadows, supra, and in support of the texts quoted from Elliott and Page on Contracts.

Appellant's able counsel, by a very ingenious and plaus-- ible argument, has attempted to apply the "rule of reason", as enunciated by the United States Supreme Court, in the Standard Oil case, (221 U. S. 1), to the case at bar. In his brief he says:

"I am not to be understood as contending that combina-- tions to suppress competition whereby as a practical result a monopoly is created or whereby prices are controlled, may not be lawfully forbidden. My contention is that it is not contrary to the public policy of any civilized state that A. and B shall contract, the one not to compete with the other in a particular business at a particular place. I take it that if the plaintiff in the case at bar had established a business in competition with the defendant Simon Bibo at Grants, and thereafter Bibo had agreed to buy all or a part of the stock in trade of the plaintiff, and plaintiff had agreed not further to compete at that place, such a contract would be conceded to be lawful and enforcible—a valid consideration for the execution of the promissory notes which, in the opinion of the makers, were equal in amount to the benefit received. But the proposition advanced seems to be that not having yet established the business the attempt on the part of Bibo to stifle this competition in its inception is unlawful, although the result accomplished is the same in each case, and there is absolutely no difference so far as the effect upon the public is concerned. If it is not unlawful to stifle competition after it has once obtained a foothold, no reason can be advanced why such competition may not with equal propriety be stifled before it has obtained a foothold."

If the "rule of reason" be applied to this contract it will not help appellant. Under this doctrine, which was firm- ly established by the Standard Oil case, contracts in re-- straint of trade, which are unreasonable, are invalid. While originally, at common law, all contracts in restraint of trade were presumptively invalid (Mitchel vs. Reynolds, 1 P. Wms. 181) because such contracts were deemed injurious to the public as well as to the individuals who made them. "In the interest of the freedom of individuals to contract this doctrine was modified so that it was

only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. That is to say, if the restraint was partial in its operation and *was otherwise reasonable* the contract was held to be valid." (Standard Oil Co. vs. U. S. supra.) It is the purpose of the contract which makes it reasonable or unreasonable, coupled of course with the limitations put upon the right to engage in business. If the restrictions are no broader than are necessary to protect the party in the enjoyment of the benefits of the main contract, to which the restraint is incidental, the contract would be upheld as valid, because reasonable. On the other hand, if the restrictions are so broad, that it necessarily appears that the restraint is unreasonable, the contract would be held to be illegal. Where the contract is subsidiary to the main purpose of disposing of an established business, or other legitimate object, the restraint would be held reasonable and the contract valid. In the Eastern States, R. L. D. Asso. vs. United States, U. S. Adv. Ops. 1913, page 951, the United States Supreme Court said:

"It is true that this court held in the Standard Oil and Tobacco cases, supra, and in the subsequent cases following them, that in its proper construction the act was not intended to reach normal and usual contracts incident to lawful purposes and intended to further legitimate trade, and summarizing the meaning of the act in the Tobacco case, this court said (221 U. S. 179):

'Applying the rule of reason to the construction of the statute, it was held in the Standard Oil case that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the anti-trust act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition, or unduly obstructing the due course of trade, or which, either because of their inherent nature or effect, or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance.'

The same principle was affirmed in Nash v. United States, 229 U. S. 373, 57 L. Ed. 1232, 33 Sup. Ct. Rep. 780. The court in the Standard Oil case construed the act as intended to reach only combinations unduly restrictive of the flow of commerce, or unduly restrictive of competition, and, illustrating what were such undue or unreasonable combinations, it classed as illegal (p. 58) 'all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act, or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, but, on the contrary, were of such a character as to give rise to the inference or presumption that they had been entered into or done with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, such as enhancement of prices, which were considered to be against public policy."

From the nature and character of a contract, such as this, where it clearly appears that it was not entered into with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary with the intent to do wrong to the general public and to limit the right of individuals or corporations, thus restraining competition and enhancing prices, the contract will be held invalid under the Sherman Anti-trust Act, as it would have been so deemed under the common law, and this is clearly shown, we think, by the above excerpts from the decisions of the United States Supreme Court.

In the case of Gallup Electric Light Co. vs. Pacific Improvement Co., 16 N. M. 86, the territorial supreme court discussed the question of contracts in restraint of trade. In this decision the court quotes Section 3, of the Act of Congress of July 2nd, 1890. This statute was in force in this jurisdiction at the time this alleged agreement was entered into, as New Mexico, at that time was still a territory. In the case referred to, the court quotes with ap-

proval, the following excerpt from the opinion written by Mr. Justice Peckham in the case of the United States vs. Joint Traffic Association, 171 U. S. 558:

"We are not aware that it has ever been claimed that a lease or purchase by a farmer, manufacturer or merchant of an additional farm, manufactory or shop, or the withdrawal from business of any farmer, merchant or manufacturer, restrained commerce or trade within any legal definition 'of that term; and the sale of a good will of a business with an accompanying agreement not to engage in a similar business was instanced in the Trans-Missouri case as a contract not within the meaning of the act; and it was said that such a contract was collateral to the main contract of sale and was entered into for the purpose of enhancing the price at which the vendor sells his business." See also, Thomas vs. Gavin, 15 N. M. 660.

The Anti-Trust Act must be and is construed in the light of the common law, and such a contract as that testified to by the witness, Arnot, is contrary to public policy and illegal. This being true, it follows that the court did not err in striking out this testimony. It further follows that the court properly directed a verdict for the appellees.

The judgment is therefore affirmed, and, IT IS SO ORDERED.

### SYLLABUS BY THE COURT.

