**WAHLGREN et al. v. BAUSCH & LOMB OPTICAL CO. et al.**

No. 5015.

Circuit Court of Appeals, Seventh Circuit.
Jan. 23, 1934.

Benj. F. J. Odell, Albert Sabath, and Charles Hudson, all of Chicago, Ill., for appellants.

Silas H. Strawn, John D. Black, and George B. Christensen, all of Chicago, Ill., for appellees.

Before ALSCHULER, EVANS, and FITZHENRY, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above).

The assignments of error may be considered under three headings. (a) Does the contract between Roy Wahlgren and Bausch & Lomb Company as modified prevent the former from engaging in the employment or business of manufacturing and selling optical instruments for a period of five years? (b) Does the evidence show that the other appellants knowingly joined with Roy Wahlgren in building up a business in violation of said contract of Wahlgren and appellee, Bausch & Lomb Company, or in conspiring with Roy Wahlgren to injure appellees' business? (c) Does the evidence show that Oscar G. Wahlgren participated with his brother Roy in breaching said contract or in conspiring to injure appellees' business?

Essential parts of the contracts are set forth in the margin.[1]

---

[1] (Contract, February 21, 1925.) "Seventh: It is mutually understood that during the performance of this agreement the relations between the parties hereto and the Riggs Optical Company shall, so far as is within the control of the parties hereto, be as follows: (1) said Wahlgren shall be and become the General Manager of said Riggs Optical Company and shall have an annual salary of Thirty-five thousand dollars ($35,000) per year; * * *

"Eighth: That said Wahlgren shall devote all of his time and attention to the business of the said Riggs Optical Company, and shall not be or become engaged in any competing company or industry during the term prescribed for the performance of this agreement, except with the written consent of the Bausch & Lomb Optical Company. If, for any reason, his employment or relations with the Riggs Optical Company shall be terminated during said term, then he shall not become interested, either directly or indirectly, in any competing concern or industry at any place in the United States west of a line drawn due north and south through the City of Detroit, Michigan."

(Contract, February 13, 1930.) "Third: If, during the remainder of the calendar year 1930, the said Wahlgren shall so conduct himself that his personal habits and mode of living are satisfactory to the Company and his handling of the business and affairs of the Riggs Optical Company are satisfactory to and approved by the Company, it agrees that it will:
* * * * * * * *

"(3) permit the said Wahlgren to carry on under the provisions of said agreement of February 21, 1925, as heretofore modified * * * and as modified by * * * this agreement, so long as he shall * * * perform all the provisions of said contract of February 21, 1925, as modified, and all the provisions of this contract upon his part to be performed.

"Fourth: If, however, at any time prior to January 1, 1931 the personal habits. conduct or mode of living of the said Wahlgren, or his management of the business and affairs of the Riggs Optical Company are not satisfactory to the Company (as to which the Company and its Board of Directors shall be the sole judges * * *) then and in that event, the Company may elect to terminate and cancel the said agreement of February 21, 1925, by giving to the said Wahlgren written notice of its election so to do; * * * whereupon, the said agreement of February 21, 1925, together with any and all modifications thereof, shall be and be deemed to be terminated and cancelled in all particulars and for all purposes, and the said Wahlgren shall be relieved and released from all obligations expressed in said agreement or arising therefrom, provided however, that the Company shall * * * repay to the said Wahlgren all sums of money paid by him to the Company under the said agreement and shall return to him all shares of stock of the Riggs Optical Company then held by the Company as collateral security to his indebtedness, excepting only the 5808 shares which the Company has, by the terms of said agreement, agreed to sell to the said Wahlgren.

"Fifth: In case the said contract of February 21, 1925 be terminated and cancelled as hereinbefore provided, it is understood and agreed:

"(1) That the said Wahlgren may continue as General Manager of the Riggs Optical Company for such term and at such salary as may be agreed upon by the Board of Directors of the Riggs Optical Company and the said Wahlgren, and a contract shall be entered into by the said Riggs Optical Company and the said Wahlgren providing for the term of his employment as General Manager, the salary to be paid to him, that he shall devote his entire time, attention and best efforts to the business of the Riggs Optical Company, that he shall not be

In 1925, one Elwood Riggs, founder of the Riggs Company, sold his interest in said company for $1,667,500 to Bausch & Lomb Company; said interest to be paid for over a period of ten months. The contract of sale provided that during the .said ten months' period appellant Roy Wahlgren should be given control of the company. About the same time Wahlgren entered into a separate contract with Bausch & Lomb Company to purchase from it a large block of the stock which had been acquired from Riggs. He executed his twenty year interest bearing note for $850,000, which covered the purchase price of the stock, and which was to be paid from the dividends paid on the stock and $20,000 annually from his salary. Roy Wahlgren thereupon became president and general manager of the Riggs Optical Company, and his salary was $35,000 per year. During the period covered by this contract, he became involved in marital troubles, and his conduct and personal habits were such as to prevent the continuance of the contract along the lines originally planned. After repeated efforts had been made to induce his reformation, Roy Wahlgren tendered his resignation at the request of the Riggs Company, which resignation was accepted by the Board, and he was removed as president and general manager of the company. Before this, however, the original contract was modified, but not in a manner which necessitates a hæc verba statement of the entire modification. Wahlgren contends that the modification released him from the restrictive covenant of the original agreement. Subdivision 3, paragraph 5, provided:

"(3) That in case of the termination of his employment by the Riggs Optical Company, the said Wahlgren shall not, and hereby covenants and agrees that he will not, within five (5) years from the date of the termination of such employment, enter the employ of or become or be interested in any

or become engaged in any competing company or industry during the term of such employment, and that for a period of five (5) years after the termination of such employment he shall not become or be interested, either directly or indirectly, in any corporation, partnership, concern or business competing with the said Riggs Optical Company.
\* \* \* \* \* \* \* \* \*
' "(3) That in case of the termination of his employment by the Riggs Optical Company, the said Wahlgren shall not, and hereby covenants and agrees that he will not, within five (5) years from the date of the termination of such employment, enter the employ of or become or be interested in any corporation, partnership, concern or business engaged in the manufacture or sale of optical instruments or apparatus anywhere within the United States of America west of a line drawn due North and South through the City of Detroit, Michigan."

corporation, partnership, concern or business engaged in the manufacture or sale of optical instruments or apparatus anywhere within the United States of America west of a line drawn due North and South through the City of Detroit, Michigan."

Appellees contend this proviso governs, while appellant Roy Wahlgren argues that it does not.

After he severed his relations with appellees, Wahlgren immediately engaged in the business of manufacturing and selling optical goods and shortly thereafter organized the Wahlgren Optical Company and induced employees of the Riggs Optical Company to leave their employment and join him in his new venture. Appellees assert that in so doing he violated the provisions of the aforesaid agreement and that he also originated a conspiracy, in which his brother Oscar and the other appellants participated, to injure and destroy by unfair means the optical business of Riggs Optical Company This charge, the appellants also denied.

■ There can be no doubt as to the parties' right to legally contract so as to exclude Roy Wahlgren from engaging in the optical business for a period of five years. Broxham v. Borden's Farm Products Co. of Ill. (C. C. A.) 53 F.(2d) 946; Wark v. Ervin Press Corporation (C. C. A.) 48 F.(2d) 152. The territory covered by the contract was restricted. The period was limited to five years. The relations of the parties and their situation made the agreement reasonable.

■ Appellants contend, however, that because the modification or second contract provided that the

"said agreement of February 21, 1925, together with any and all modifications thereof, shall be and be deemed to be terminated and cancelled in all particulars and for all purposes, and the said Wahlgren shall be relieved and released from all obligations expressed in said agreement or arising therefrom, \* \* \* "
Wahlgren was relieved of the negative employment clause of the original agreement, or, in other words, the original agreement with its restrictive employment covenants was terminated.

It is appellants' contention that subdivision 3, paragraph 5, applies only in case of the termination of Wahlgren's employment under and by virtue of paragraph 5 of said modified agreement. We can not agree with this conclusion. The fair construction of the second contract is that it canceled the agree-

ment of February 21, 1925, subject, however, to several exceptions, one of which is found in subdivision 3 of paragraph 5.

While we are not inclined to extend any restrictive employment covenant beyond what is clearly provided by the contract of the parties, we are unable (once such agreement is clearly established) to construe an amendment thereto in any way different from any other contract.

A fair construction of the February, 1930, contract including paragraphs 4 and 5, and particularly subdivisions 1 and 3 of paragraph 5, leads to this conclusion and to none other. Wahlgren's conduct and failure to make payments on his note had been so disappointing that the old contract had to be modified. Hope of Wahlgren's reformation was still entertained, however, and paragraphs 4 and 5 were drawn on the basis of this hope. In case the original contract was canceled, it was still the hope and plan of the parties to retain Wahlgren as general manager, but on a different salary basis. A new agreement was to be executed which was to contain negative employment covenants such as were provided for in subdivision 1 of paragraph 5. The contingency thus provided for never arose for Wahlgren's conduct became such as to cause him to tender his resignation. The resignation was not accepted, but some months later the Riggs Company acted, and the following resolution was passed:

"'* * * that because of his personal conduct and habits which have been detrimental to the business of the corporation and because of his unauthorized withdrawals of money from the corporation, the said Roy M. Wahlgren be, and he is, hereby removed as president and general manager of this corporation.'"

It was this action which invoked subdivision 3 which covered just such a situation. The negative employment covenants therein contained became effective, and Wahlgren for five years from said date was not permitted to enter the employ or become interested in any corporation, partnership, concern, or business engaging in the manufacture or sale of optical instruments within designated territorial lines.

Our examination of the testimony convinces us that the master was amply justified in finding Wahlgren, in open and flagrant violation of the agreement binding upon him, engaged in the manufacture and sale of optical instruments in the territory which he, by his agreement, had excluded from the field of his activity.

As to appellants, other than Oscar Wahlgren, the testimony established with equal clarity that they knowingly joined Roy Wahlgren in his unlawful enterprise and in violation of his contract with Bausch & Lomb Company. They were evidently given inducements which caused them to leave their old company and to resort to unfair trade methods which could not have been justified, even though Wahlgren had not agreed to remain out of the optical manufacturing field. The record discloses a situation in which neither contract obligation nor legitimate trade methods were respected.

As to Oscar Wahlgren's participation in his brother's unlawful enterprise, it is argued that the evidence is not sufficient to support the findings made by the master and sustained by the District Court. Unfortunately, the testimony is not printed. The typewritten copy fills three large volumes of approximately 600 pages each and includes the testimony of many witnesses. No less than nine witnesses involved Oscar in the activities in one way or another. He did not see fit to testify in denial or explanation of any of the testimony given against him, from which we are justified in assuming that any explanation which he could have offered would have been worse than the unexplained testimony and the inferences deducible therefrom. Mammoth Oil Company v. United States, 275 U. S. 13, 52, 48 S. Ct. 1, 72 L. Ed. 137.

Oscar Wahlgren contends that he was not given an opportunity to testify before the master. The record before us shows that the District Court gave him such opportunity and fixed the time at which he might appear and give his testimony before such trial judge in open court. He failed to avail himself of this opportunity. It is now argued that this showing made before the District Court was not properly incorporated in the certificate of evidence and is not properly before us. We think otherwise.

No satisfactory explanation of this appellant's conduct and of his participation in the enterprise can be made on the hypothesis of his innocence. He was an attorney at law, practicing in Chicago. The year 1930, when the new enterprise was launched, was not a particularly favorable year for an attorney to embark in the optical business in Chicago. The depression was deep and growing worse. Prices were falling. Busi-

ness was bad. Yet, in the face of these facts, we find this attorney organizing a corporation for the conduct of a business with which he was not familiar. He knew his brother was barred from lawfully participating in such a business in Chicago. Take the testimony of the witness Bradley who stated that he called on Oscar Wahlgren one evening and was told by Oscar that "he had been down East with Roy Wahlgren and that * * * Roy Wahlgren's name was simply typical of good things in the optical business, and that he thought he would capitalize on it and that Roy had recommended that I was the man to head up the organization. * * *."

He further stated that Oscar Wahlgren said he would take care of the organization of the corporation; that the first time he knew he was going to be president of the Wahlgren Optical Company was the first time he talked to Oscar Wahlgren; that he discussed the question of the location of the new offices with only Oscar and Roy Wahlgren and told them they should be located in the Mallers Building; that it must have been around December 1, 1930, when the location of the new offices was definitely determined; that Oscar and Roy Wahlgren and he decided that; that he didn't know when the lease was signed, but he thought Oscar signed it, as he was acting as president of the company, and he (Bradley) was not an officer until after he left Riggs; and that he thought it was Oscar who had told the building officials and plumbers to put the place in shape. In respect to his signing the lease at that time, he remembered Oscar called him on the phone and he went to Roy's office and both Oscar and Roy were there. Roy said that the organization of the corporation out in Omaha had not been completed and that as a matter of form he wanted him to sign the lease, and as soon as the corporation was formed out there, it would be changed over.

A great deal more testimony of a similar nature was received showing rather conclusively that Oscar was as active in the new venture as was his brother. Standing isolated and apart from the rest of the testimony, many of the acts of Oscar Wahlgren might be explained on the theory that he was acting as attorney, who, as such, drew leases, incorporated companies, and interviewed the interested parties. But his activities far exceeded those of an attorney drawing legal documents for a client. His actions and his words both indicate he was a participant, if not the originator, of the scheme to avoid the provisions of the agreement which excluded his brother Roy from participation in the optical field for five years. One may not use his license to practice law as a shield to protect himself from the consequences of his participation in an unlawful or illegal conspiracy. Holt v. United States (C. C. A.) 45 F.(2d) 392. We conclude the master was justified in finding Oscar was one of the coconspirators in the unlawful enterprise which was conceived and executed by his brother in violation of that gentleman's written contract.

Other questions raised by appellants have been duly considered, but none of them merits separate treatment.

The decree is affirmed.