**HEDRICK et al. v. PERRY.**
No. 1785.

Circuit Court of Appeals, Tenth Circuit.
March 3, 1939.

Fred E. Wilson, of Albuquerque, N. M. (James F. Warden, of Albuquerque, N. M., on the brief), for appellants.

G. Dexter Blount, of Denver, Colo. (Harry S. Silverstein, of Denver, Colo., and H. Leslie Williams, of Albuquerque, N. M., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

BRATTON, Circuit Judge.

This was a suit in equity to enjoin further breach of contract and for damages for past breach. Reference will be made to J. D. Perry, plaintiff below and appellee here, as Perry, and to Wasco T. Hedrick, Carl Penn, and Penn Trucking Company, Inc., defendants below and appellants here, as Hedrick, Penn, and Penn Company, respectively.

The court found that for several years Perry and Hedrick were competitors in the trucking business between Albuquerque, New Mexico, and Denver, Colorado, and intermediate points; that Hedrick developed a large number of regular customers in his business; that on April 14, 1937, Hedrick, with the knowledge of Penn and Penn Company, entered into an oral agreement with Perry in which it was agreed that for a cash consideration of $8500, then and there paid, he would and did sell, assign, and transfer to Perry his trucking business, the entire good will thereof, the three trucks with one refrigerator plant used in the operation of such business, and the regularly issued permits under which the trucks were operated; and that the trucks and refrigerator plant were of an aggregate value not to exceed $3000, as Perry, Hedrick, Penn, and Penn Company well knew. The court also found that the contract provided that Hedrick would immediately discontinue the trucking business between the points named, except between Albuquerque and Santa Fe, New Mexico, and would not further compete with Perry directly or indirectly; and that he would exert his best efforts to induce his customers to continue as customers of Perry. The court further found that immediately after the oral agreement was entered into the parties executed a written contract in which Hedrick bound himself to refrain for a period of ten years

from engaging directly or indirectly in the trucking business over the route in question, except between Albuquerque and Santa Fe. And the court further found that shortly before the date on which such contracts were entered into, Hedrick, Penn, and Penn Company formed a conspiracy to cheat and defraud Perry; that the substance of the conspiracy was that upon Hedrick inducing Perry to enter into the contract with him, Hedrick, Penn, and Penn Company would cause Penn Company to qualify through authorizing permits and become a competitor of Perry in the trucking business, and that Hedrick would then endeavor to cause to be transferred to Penn Company the customers, business, good will, and employees of Hedrick instead of causing them to be transferred to Perry; that pursuant to such conspiracy Penn Company became qualified and entered the trucking business in competition with Perry; that Hedrick thereby engaged and has continued to engage, directly or indirectly, or concern himself in carrying on or conducting the business of trucking in competition with Perry in violation of the contract; and that as a result of the conspiracy and the acts of Hedrick, Penn, and Penn Company in furtherance of it, Perry was cheated and defrauded, and suffered damages in the sum of $7500.

By decree, Hedrick was enjoined for a period of ten years from the date of the contracts from engaging directly or indirectly in the trucking business in competition with plaintiff, except between Albuquerque and Santa Fe; and damages in the sum of $7500 were awarded against Hedrick, Penn, and Penn Company.

It is contended that there was no evidence of a conspiracy, no evidence of actionable injury on the part of Perry for which Hedrick, Penn, and Penn Company are liable, and no competent evidence that Hedrick violated either the oral or the written contract. As we understand these several contentions, they merely challenge the sufficiency of the evidence to support the findings of the court in respect to the formation of the conspiracy, the breach of the contract, and the accrual of injury for which damages may be had. They are so interwoven that they may be considered together. There was evidence which tended to show these facts. Perry and Hedrick each had an established and efficiently managed trucking business. At the conclusion of negotiations which covered about two weeks in time, they entered into the oral contract on April 14, 1937, in which it was agreed that Hedrick would sell, assign, and transfer to plaintiff his business and good will, the three trucks and one refrigerator plant used in such business, and the permits—one issued by the Corporation Commission of New Mexico, and the other issued by the Public Utilities Commission of Colorado—for the agreed consideration of $8500. It was further agreed that Hedrick would discontinue the trucking business between the points named, except between Albuquerque and Santa Fe, would turn over to Perry his telephone numbers and docks, and would help Perry in any way he could to hold the business which Hedrick then had. It was also agreed that Hedrick would aid in making arrangements for his truck-drivers and other employees to continue in the employ of Perry. The consideration was paid and the property transferred. Immediately thereafter the written contract was prepared and executed. It adverted to the oral agreement and recited that the property was being sold and transferred contemporaneously with the execution of the written contract; and it then provided that for a period of ten years from that date Hedrick should not engage directly or indirectly, or concern himself either as principal, agent, or servant, in carrying on or conducting the business of motor carrier of merchandise between the points named in competition with Perry.

Hedrick and Penn had known each other for about thirty years. They had grown up together. For some time prior to May 30, 1936, Penn was engaged in the trucking business between Trinidad, Colorado, and various points in New Mexico, but his operations did not reach Denver and he did not receive any business from that point. Penn Company was incorporated on May 30th for the purpose of taking over the business conducted by Penn. The entire authorized capital stock was issued to Penn except two qualifying shares. On the following day—May 31—Hedrick and an associate purchased at a sale in bankruptcy two permits authorizing the transportation by freight on the highway between Albuquerque and Denver. One, issued by the Corporation Commission of New Mexico, applied to that part of the highway in New Mexico; and the other, issued by the Public Utilities Commission of Colorado, had application to that part in Colorado. These are referred to as the

Eagle Permits. Hedrick and his associate transferred them to Penn Company in September, 1936, for an agreed consideration of $11,000, payable at the rate of $300 per month. Penn planned to extend the trucking line of Penn Company into Denver, and the monthly payments were to be made out of the earnings of the operations between Albuquerque and Denver. With that in mind, it was provided that the first payment should be made ninety days after operation of the extended line began. Perry knew at the time he purchased the business from Hedrick that the latter had purchased the Eagle Permits, but he did not know that they had been assigned to Penn Company. He had never heard of Penn, and he did not know that Penn Company existed. He understood that under a rule of the Interstate Commerce Commission permits were cancelled when not used, and he thought or assumed that the Eagle certificates had been cancelled for nonuse. Hedrick did not say anything to him in the course of their negotiations respecting these permits. In November, 1936, Penn Company submitted petitions for approval of the assignments of the permits to the respective commissions of the two states and to the Interstate Commerce Commission. The last approval was granted May 5, 1937. Penn Company began the operation of trucks between Albuquerque and Denver under such permits about April 21, 1937, and it has been in constant and regular competition with Perry ever since, but none of the monthly payments of $300 has been made to Hedrick.

Hedrick had six truck-drivers. When Perry took over the business he offered to continue them in the same work at the same wages, but three of them quit immediately and the other three followed within two or three weeks. Some of them left their trucks at various places—just called up and said they were quitting. Most of them started to work for Penn Company. Hedrick had four other employees. Three of them quit and became employees of Penn Company; and Penn offered to employ the fourth but she declined and remained with Perry. Penn Company acquired the office in Denver formerly occupied and used by Hedrick. Girard had been manager for Hedrick there; he continued in the employ of Perry for about a week during which time he had access to the office records showing the names of Perry's customers and the amount of work he was doing; and he then quit without notice and became manager for Penn Company in Denver. He authorized the telephone company to disconnect the telephone formerly used by Hedrick, asked for the refund due, and sought to obtain the number for Penn Company. Upon learning that the telephone had been disconnected, Perry appealed to Hedrick several times to have it re-connected and the number assigned to him. Hedrick replied that he was not interested and that it was Perry's lookout. The telephone was re-connected, remained so for about a day, and then was again disconnected. Perry then appealed to Girard. He said that he was not interested and would not do anything about it, and hung up the telephone. The manager of the telephone company called Hedrick and told him that both Perry and Penn were demanding the telephone. Hedrick replied that he had discontinued his business, that the telephone was cancelled, that he could not sell the number, and that so far as he was concerned he would not give it to anyone. After two or three days of conflict and confusion during a part of which time the telephone was out of use, Perry finally persuaded the company to let him have the number. For awhile Penn Company used some of the manifests of Hedrick, one name being strickened out and the other inserted. Hedrick furnished Perry a list of his customers. Perry failed to get any business from many of them. He and his representatives interviewed virtually all of them in an effort to hold their business. Inquiry was made as to what was wrong and why he was not getting their business. Some replied that they had been advised that Penn had taken over the Hedrick line, and others stated that without knowing Hedrick had sold to Perry they called the Hedrick number and in response Penn Company had been picking up their shipments. Pretending to be customers, Perry and his representatives called by telephone the Hedrick office in Albuquerque several times, and asked that freight for Denver be picked up. In some instances the reply was that Hedrick had discontinued operating to Denver and that Penn Company had taken over his business, and in other instances they were told to call a certain number which was that of Penn Company. Perry went to Hedrick several times. He asked why Hedrick was trying to divert the business to Penn. On the first occasion Hedrick said that he did not know anything about it. But on a subsequent

occasion when Perry asked if he would not fulfill his contract and try to get the business for Perry instead of throwing it to Penn Company, he replied that he naturally could not do so. Quoting from the testimony of Perry, "He said, if someone owed you $300.00, and if someone (was) supposed to pay you $300.00 per month, you would naturally try to convert the business over to them." In the course of further conversation he stated that Penn Company owed him $11,000. As manager for Penn Company, Girard solicited business from former customers of Hedrick in Denver and Pueblo. In doing so, he told some of them that Penn Company had bought one of the permits formerly owned by Hedrick. About ninety per cent of Hedrick's business originated at Denver, Albuquerque, and intermediate points, while the remaining ten per cent was inter-line business, meaning freight originating east of Denver and received from other carriers. Perry did not get any of the inter-line business. It disappeared entirely at the outset. The other business diminished sharply from month to month. It dwindled to the point that gross revenue during the first ten days in July was only $271.52. No separate record was kept after that date. There was evidence tending to prove other facts. Much of the evidence tending to establish the facts stated was sharply controverted. Hedrick and Penn denied that they formed a conspiracy or acted in concert to secure business for Penn Company. Hedrick denied that it was agreed as a part of the verbal contract that he would assist Perry in holding the business of his former customers; denied that he solicited any of such customers not to do business with Perry or to do business with Penn Company; and denied that he sought to prevent Perry from obtaining the telephone number. Penn denied that he interfered with the truck-drivers or other employees, or employed most of the truck-drivers after they quit Perry. But that and other evidence submitted merely formed conflicts for the court to determine.

■ Two well established principles should be brought into view as the criteria for determining the contentions respecting the sufficiency of the evidence. First, a conspiracy to cheat and defraud may be proved by circumstantial evidence. In the very nature of things, the existence of a conspiracy is generally a matter of inference deduced from acts and declarations of the parties. The existence of the joint assent of the parties need not be proved directly. Like any other ultimate fact, it may be found as an inference from facts proved. It is enough if the evidentiary facts and circumstances—pieced together and considered as a whole—convince the judicial mind that the parties united in an understanding way to accomplish the fraudulent scheme. Drake v. Stewart, 8 Cir., 76 F. 140; Calcutt v. Gerig, 6 Cir., 271 F. 220; Holbert v. Allred, 24 Ga.App. 727, 102 S.E. 192; Stoner v. Wilson, 140 Kan. 383, 36 P.2d 999; Addison v. Wilson, 238 Ky. 143, 37 S.W.2d 7. Next, while the findings of fact made in an equity case are not conclusive on appeal, they are presumptively correct and will not be disturbed unless serious mistake was made in the consideration of the evidence. Kretni Development Company v. Consolidated Oil Corporation, 10 Cir., 74 F.2d 497; Humphrey v. Bankers Mortgage Co., 10 Cir., 79 F.2d 345; Gaskins v. Bonfils, 10 Cir., 79 F.2d 352, 353; Freiberg v. Pierce, 10 Cir., 83 F.2d 961; Whitchurch v. Crawford, 10 Cir., 92 F.2d 249. Appropriate application of these principles leads to the conclusion that there was substantial evidence to support the findings of the court; that no serious mistake appears in the consideration of the evidence; and that the findings must stand.

■ The award of damages is challenged on the ground that the damage alleged was remote, speculative, and contingent; that there was no tangible basis on which to predicate any loss; and that there was no competent evidence from which the court could find or ascertain the amount of the damages. The cause of action pleaded in respect to damages was loss of profits on business which would have been earned and received except for the concert of action of Hedrick, Penn, and Penn Company in diverting the business from Perry to Penn Company. Anticipated profits from a business which is contemplated but not established are too remote and speculative to form the basis on which to recover damages for the reason that there are no facts from which the amount of such profits can be determined with the degree of certainty required by law. Howard v. Stillwell & Bierce Manufacturing Co., 139 U.S. 199, 11 S.Ct. 500, 35 L.Ed. 147; Ellerson v. Grove, 4 Cir., 44 F.2d 493; Milheim v. Baxter, 46 Colo. 155, 103 P. 376, 133 Am. St.Rep. 50; Kettering Mercantile Co. v.

Sheppard, 19 N.M. 330, 142 P. 1128; California Press Manufacturing Co. v. Stafford Packing Co., 192 Cal. 479, 221 P. 345, 32 A.L.R. 114; Blakiston v. Osgood Panel & Veneer Co., 173 Wash. 435, 23 P.2d 397. But the business in question here was not merely contemplated. It was established, had existed for several years, and was reasonably stable in volume. It could not be reasonably expected that Perry would hold all of it, but in view of his experience and efficiency in the trucking business it was not too much for the court to determine that he would have retained most of it if Hedrick had aided him and co-operated with him in the manner required by the contract.

The tendency of the early cases was to restrict the recovery of damages to matters which were susceptible of having attributed to them an exact pecuniary value. But that rigid rule has been relaxed in some measure. Recovery cannot be had where there is uncertainty whether a contract has been breached or a tort committed, but damages may be awarded where there is no uncertainty as to whether the rights of plaintiff have been invaded even though there may be some uncertainty in respect to the amount of the damages sustained. The amount need not be proved with absolute certainty. It is enough if the evidence adduced is sufficient to enable the court or jury to make a fair and reasonable approximation. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Hoffer Oil Corporation v. Carpenter, 10 Cir., 34 F.2d 589; Shannon v. Shaffer Oil & Refining Co., 10 Cir., 51 F.2d 878; Stanolind Oil & Gas Co. v. Kimmel, 10 Cir., 68 F.2d 520; Indian Territory Illuminating Oil Co. v. Townley, 10 Cir., 81 F.2d 159; Excelsior Motor Manufacturing & Supply Co. v. Sound Equipment Co., 7 Cir., 73 F.2d 725; Commonwealth Trust Co. v. Hachmeister Lind Co., 320 Pa. 233, 181 A. 787.

We inquire whether the proof was sufficient for that purpose. The gross receipts from Perry's business in 1936 were more than $67,000 and the net profit exceeded $8000; the gross receipts for January, February, March, and the first half of April, 1937, exceeded $4000, $4800, $6400, and $3300 respectively; and the gross receipts for the year 1937 (excluding to July 15 the business acquired from Hedrick) exceeded $88,000 while the net profit was more than $10,000. Hedrick's business was larger in volume than that of Perry. The profit from the trucking business of the kind they conducted was usually about twelve per cent of the gross receipts. These facts, established on the trial, afforded an adequate basis on which to make a fair and reasonably accurate finding of the damages sustained; and the amount fixed indicates that the court made a reasonable allowance for the loss of business which was reasonably to be expected had Hedrick fulfilled the contract as he was obligated to do.

The validity of the written contract is attacked on the ground that it was an agreement to refrain from competition in the business of a common carrier in interstate commerce for hire, and was in restraint of trade which affected the public interest; and the oral contract is attacked in like manner insofar as it involved an obligation not to compete. The two contracts related to the same subject matter, and the latter expressly made reference to the former. They should be considered together as constituting a single contract. Doherty Research Co. v. Vickers Petroleum Co., 10 Cir., 80 F.2d 809; Positype Corporation v. Mahin, 2 Cir., 32 F.2d 202. Thus construed, the contract was one for the sale of all the trucks and the refrigerator plant used in the conduct of the business, the permits under which the trucks were operated, and the good will of the business with provision that the vendor should not compete with the vendee. But the provision forbidding competition was not unlimited in respect to time and area. It was limited in both respects. It was for a period of ten years and it applied only to a single route. Three other established companies were engaged in the trucking business over that route. There is no suggestion that the purpose of the contract was to bring about inadequate trucking facilities or an increase in rates. No injury to the public in either respect was expressly or impliedly contemplated. While one purpose of the agreement admittedly was to eliminate a competitor, the provision against competition, reasonably limited in time and place, was subsidiary to the main purpose of the sale and purchase of an established business and was no broader than was reasonably necessary to protect the good will of such business. Contracts in total or substantially total restraint of trade are void, but a limited provision of this kind subsidiary to the main purpose of the contract and

808

not injurious to public interest does not objectionably stifle competition or impose an unreasonable restraint upon trade. Mc-Cluer v. Super Maid Cook-Ware Corp., 10 Cir., 62 F.2d 426; Lumbermen's Trust Co. v. Title Insurance & Investment Co., 9 Cir., 248 F. 212; Wahlgren v. Bausch & Lomb Optical Co., 7 Cir., 68 F.2d 660; Wawak Co. v. Kaiser, 7 Cir., 90 F.2d 694; In re Hale Desk Co.,.2 Cir., 97 F.2d 372; Thomas v. Gavin, 15 N.M. 660, 110 P. 841; Gallup Electric Light Co. v. Pacific Improvement Co., 16 N.M. 86, 113 P. 848; Gross, Kelly & Co. v. Bibo, 19 N.M. 495, 145 P. 480; Swanson v. Kirby, 98 Ga. 586, 26 S.E. 71; Up River Ice Co. v. Denler, 114 Mich. 296, 72 N.W. 157, 68 Am.St. Rep. 480; Wakenight v. Spear & Rogers, 147 Ark. 342, 227 S.W. 419; Maddox v. Fuller, 233 Ala. 662, 173 So. 12; Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N.E. 747; Koppers Products Co. v. Readio, R.I., 197 A. 441.

The remaining contention is that the court admitted certain hearsay testimony. There is no need to inquire whether the testimony was open to the objection now urged. It does not appear that the court gave it any weight in deciding the case. In the absence of an affirmative showing otherwise, it will be presumed on appeal that the court considered only competent evidence and disregarded that which was incompetent. Jonah v. Armstrong, 10 Cir., 52 F.2d 343; Elliott v. Gordon, 10 Cir., 70 F.2d 9; Wall v. United States, 10 Cir., 97 F.2d 672; Wade v. Blieden, 8 Cir., 86 F.2d 75; Erceg v. Fairbanks Exploration Co., 9 Cir., 95 F.2d 850.

The decree is affirmed.