**SEBER et al. v. THOMAS et al.**

No. 1937.

Circuit Court of Appeals, Tenth Circuit.

Jan. 15, 1940.

George H. Jennings, of Sapulpa, Okl., and Creekmore Wallace, of Oklahoma City, Okl., for appellants.

Glenn O. Young, of Sapulpa, Okl., and N. E. McNeill, of Tulsa, Okl. (Norman Barker, of Tulsa, Okl., on the brief), for appellee Milford Thomas.

Joe Brown, Probate Atty., of Muskogee, Okl., for the United States.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

Wosey Deere, nee John, nee Thomas, herein called decedent, a full-blood member of the Creek tribe of Indians, duly enrolled as such opposite Roll No. 9546, of the approved rolls of the tribe, died intestate on September 2, 1938, leaving an estate consisting of her restricted Indian allotment and restricted funds and securities in custody of the Secretary of the Interior. She was a resident of Creek County, Oklahoma, and was survived by three children, the appellants herein, Evelyn Seber, Juanita McClish, nee Deere, and Jinmy Powesheik, unenrolled full-blood Indians.

Milford Thomas, herein called Thomas, claimed to be the husband of decedent at the time of her death. His relationship to decedent was the question litigated between him and appellants in the United States District Court for the Northern District of Oklahoma. Judgment was entered in said court on January 30, 1939, decreeing that Thomas was the husband of decedent at the time of her death, and that the heirs of decedent Wosey Thomas, nee Deere, nee John, are Milford Thomas, surviving husband, Evelyn Seber, daughter, Juanita McClish, nee Deere, daughter, and Jimmy Powesheik, son. From this decree an appeal has been taken to this court.

Four assignments of error are urged for consideration:

1—That the trial court erred in finding that Thomas and decedent ever contracted to resume the marital status after the decree of divorce, and in finding that appellee is the surviving husband of decedent.

2—That the trial court erred in the admission of testimony of Thomas as to transactions and communications had with decedent.

3—That the trial court erred in finding that no marriage existed between Thomas and Ada Mae Dick, and in not finding that he was the lawful husband of Ada Mae Dick at the time of his alleged ceremonial marriage to decedent.

4—That the trial court erred in finding that the decree of divorce between decedent and Thomas had not become final.

It is admitted that decedent and Thomas entered into a ceremonial marriage May 15, 1935, and lived together as husband and wife at her home in Sapulpa, Oklahoma, until September, 1937, when a decree of divorce was entered in favor of decedent against Thomas by the District Court of Creek County, Oklahoma, in an action brought by decedent against Thomas. The decree restored decedent's maiden name and provided further that it should not become absolute and become effective until six months from the date of rendition.

Appellants, however, contend that appellee Thomas was incapable of contracting a lawful marriage with decedent because he had contracted a prior common-law marriage with one Ada Mae Dick, which was undissolved.

Ada Mae Dick was a girl fifteen or sixteen years of age at the time of her alleged common-law marriage to Thomas. She was living with her parents at their home. She testified that in 1933 she and Thomas started living together at the home of her parents; that he just came there and said he was going to stay all night; that he stayed there intermittently, leaving at times and coming back; that she told her mother Thomas was going to stay, and her mother said it was all right. In response to a question by the court, Ada Mae stated that Thomas never said anything to her about marrying her; that this relationship continued during most of 1933; that then Thomas left and went down to the home of decedent and thereafter did not live with her, Ada Mae Dick, again. Julia Dick testified, in substance, that her daughter told her that Thomas was going to stay all night and that she said it was all right; that she thought "it was man and wife"; that she thought they were going to be married; that they lived together most of a year; that she considered it was a marriage between Thomas and her daughter.

A number of witnesses, both relatives and friends, testified to the relationship between Ada Mae Dick and Thomas. The substance of their testimony was that while they were generally considered husband and wife, no one ever heard them say that they were married or heard them refer to each other as husband and wife; that a child born to Ada Mae Dick was named Marvin Lee Thomas, although Ada always went by her name of Dick. No one ever heard her referred to by any other name. The records of the Public Welfare Department show that Ada Mae Dick was a recipient of public assistance; that in her application for aid she stated that she was unmarried; that she had one child, named Marvin Lee Thomas. Further entries in the records of the department of public welfare reveal that Ada Mae Dick now has two children and

that their status is illegitimate; that the status of the children in the record is based on statements made by Ada Mae Dick to the investigator.

From this testimony the trial court found that no contract of marriage had been entered into between Ada Mae Dick and Thomas. The evidence on this question is in conflict. The finding of the trial court is supported by substantial testimony and will not be disturbed by this court.

But, say appellants, even if it is conceded that no contract of marriage was entered into between Ada Mae Dick and Thomas, yet the finding of the court that Thomas was the surviving husband of decedent is erroneous because it is not based on substantial evidence showing that appellee and decedent contracted a common-law marriage subsequent to the issuance of the decree of divorce.

As stated, decedent filed an action for divorce against Thomas in the District Court of Creek County, Oklahoma. On the 25th day of September, 1937, a decree of divorce was entered which dissolved the marriage relationship existing between decedent and Thomas, restored to decedent her maiden name, and provided that the decree should not become absolute and take effect until six months from the date thereof.

Indians have a religious ceremony called a "peyote meeting." This is an old traditional ceremony. It is called upon the birthday of him for whom the meeting is being held. The purpose of the meeting is to pray for such person, beseeching God to make a useful man of him, in the belief that such prayers will be answered and the person will grow up to be a useful man. Decedent decided to hold such a meeting on the birthday of her grandson, John Paul. It was held within the six months period provided for in the decree of divorce and before the decree became absolute by its terms. The meeting is an all-night ceremony. The people gather from the surrounding countryside, tents are erected, and food is provided. In the course of the meeting prayers are offered by many persons, and a ritualistic ceremony is carried on.

As a part of the ceremony, holy tobacco is smoked. This tradition comes down from the early days of the smoking of the pipe of peace between Indians and white men. During these ceremonies it is customary for the husband and wife to sit together and partake of this sacrament, and when a man and woman partake of it together the people look on them as man and wife. As a part of the ceremony they eat peyote; they also burn cedar and make a burnt offering of it and ask God to bless them.

The testimony of those attending and participating in this meeting was that decedent and Thomas sat together throughout the ceremony, smoked the pipe together, ate the peyote together, and offered up burnt offerings of cedar. Jacob Rowland, who participated in the ceremony, stated that decedent told him that after the meeting Thomas and she were going to try to do better; that to his knowledge they continued to live together thereafter; that they came to the meeting together; that he offered prayer publicly and referred to them in this prayer as husband and wife. Subsequent to this religious ceremony Thomas moved back into the home of decedent, his clothes were found in her closet, he occupied the same room and the same bed with her.

Sylvia Heidinger testified that Thomas and decedent came to her home after they were reunited; that she asked them if they had made up; and that decedent replied that they were thinking about it; that being asked whether she was going to marry him again, decedent replied: "I don't think it is necessary, we are the same as married, because the six months is not up."

Decedent and Thomas, together with other members of her family, made a trip to California. They stopped there at tourist cabins, where Thomas registered as "Milford Thomas, wife and family." He introduced decedent to various people as his wife. He tried to rent a house, stating that he wanted a house for himself and his wife. There is a volume of other testimony by people who knew them in and around their residence in Oklahoma to the effect that they were known as husband and wife, and were so considered, and that decedent on frequent occasions referred to Thomas as her husband.

On the other hand, the undertaker testified that after decedent was killed in an automobile accident, he notified Thomas of her death, asking him if he was her husband, and that Thomas replied that he had been, but was divorced. Several other witnesses for appellants testified that when Thomas was asked about being the hus-

band of decedent at the time of her death, he denied the relationship.

■ From this maze of conflicting testimony the court concluded and found that decedent and Thomas agreed to become husband and wife and resumed their marital relation after their divorce and regarded themselves as husband and wife. There is a clear conflict in the evidence. The court resolved this question against appellants and in favor of appellee and found that there was a resumption of marital relations between decedent and Thomas after the granting of the divorce.

■ It is the established rule of this court that where a decision is rendered by a trial court on conflicting evidence, the same will not be disturbed in the absence of a clear showing of abuse of discretion or unless a serious mistake has occurred. Youngblood et al. v. Magnolia Pet. Co., 10 Cir., 35 F.2d 578; Standard Oil Co. of Colorado v. Standard Oil Co., 10 Cir., 72 F.2d 524. No such showing appears in the record. The finding of the trial court is approved.

The disposal made of the first assignment of error makes it unnecessary to consider appellant's fourth assignment of error. If Thomas and decedent contracted a common-law marriage subsequent to the issuance of the decree of divorce, then it is immaterial whether the decree of divorce was a final and absolute decree or not.

■ Appellants further complain of the erroneous admission of testimony in that the trial court permitted Thomas to testify to transactions had with decedent tending to establish the resumption of marital relations. It is not necessary in the decision of this case to determine whether the evidence complained of fell within the prohibited rule as to transactions had with a deceased person, for in an action tried without a jury it will be presumed on appeal that the trial court disregarded incompetent testimony and considered only competent evidence. Anderson v. United States, 8 Cir., 65 F.2d 870; Wall et al. v. United States, 10 Cir., 97 F.2d 672; Hedrick v. Perry, 10 Cir., 102 F.2d 802. Disregarding entirely the testimony of Thomas as to any transactions had by him with decedent in connection with their resumption of marital relations, there is ample competent testimony to sustain the finding of the court on this question.

The judgment of the trial court is affirmed.